An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1031
NORTH CAROLINA COURT OF APPEALS

Filed: 6 May 2014

IN THE MATTER OF:

H.M.                                    Buncombe County
                                        No.  12 JA 44

Appeal by Respondent-Mother from order entered 13 June 2013[1] by Judge Ward D. Scott in Buncombe County District Court. Heard in the Court of Appeals 27 March 2014.

John C. Adams for Petitioner Buncombe County Department of Social Services.

Appellate Defender Staples Hughes, by Assistant Appellate Defender J. Lee Gilliam, for Respondent-Mother.

Michael N. Tousey for Guardian ad Litem.

STEPHENS, Judge.

*Background*

Respondent-Mother appeals from the trial court's order adjudicating her daughter, Hayley,[2] to be neglected. The matter

---

[1] Clerical errors in the trial court's 13 June 2013 order were corrected by order entered 25 June 2013.

first came on for hearing in February 2013, and the trial court made the following pertinent findings of fact in its 13 June 2013 adjudication judgment and disposition order:

> FINDINGS OF FACT BY CLEAR AND CONVINCING EVIDENCE:
>
> . . .
>
> 11. [A social worker], [Hayley's court counselor], and [a mental health therapist], testified at th[e] hearing, and the [c]ourt found their testimony to be credible and relevant to the matters contained within the petition[] and made findings of fact based upon their testimony. [Hayley] testified at th[e] hearing[,] and the [c]ourt found her testimony not credible, stating that "it is easy to determine that [Hayley] has not told the truth; [she] is 17 years of age and wants to go home."
>
> . . .
>
> 13. On August 24, 2012[] the Buncombe County Department of Social Services ("[DSS]") received a [c]hild [s]ervices [r]eport . . . alleging abuse and neglect. The report alleged the following: that [Hayley] had been at Trinity Place[, the local youth shelter,] since August 22, 2012; that [Hayley] will remain at Trinity [Place] until August 27, 2012; that [Hayley] was placed at Trinity [Place] as a result of an alter[c]ation with . . . [R]espondent[-M]other; that . . . [R]espondent[-M]other started slapping [Hayley]; that [Hayley] started hitting . . . [R]espondent[-M]other back; that [Hayley] tried to leave; however, . . .

---

² A pseudonym is used to protect the juvenile's identity.

[R]espondent[-M]other blocked the door and pulled [Hayley] down by the hair and was hitting her again; that, after some time, . . . [R]espondent[-M]other came and checked on [Hayley], asking her if she was okay and checked her for bruises.

14. The report further alleged that [Hayley's] adult brother was present during the altercation and that . . . [R]espondent[-M]other told him she had to leave before she hurt [Hayley].

15. The report further alleged that . . . [R]espondent[-M]other has been verbally abusive to [Hayley]; that . . . [R]espondent[-M]other has made the following statement to [Hayley], "If I could get away with it, I'd beat her ass, I'd hurt you." It is further alleged that . . . [R]espondent[-M]other has threatened to "[b]eat the shit out of [Hayley]."

16. The report further alleged that [Hayley] has been diagnosed with [m]ajor [d]epressive [d]isorder; that [Hayley] has sleeping and anxiety issues.[3]

17. It was further alleged that [Hayley] is the scapegoat in the family and is blamed for everything; that [Hayley's] sibling . . . [is] not treated in the same manner as [Hayley]; that [Hayley] is fearful of . . . [R]espondent[-M]other and is fearful that . . . [R]espondent[-M]other will hurt her; that the sibling . . . has pushed, choked[,] and thrown [Hayley] to the ground; that . . . [R]espondent[-M]other watches these fights and states that it is just a brother-sister rivalry.

. . .

---

[3] *See* footnote 4, *infra*.

19. The same date of the report [to DSS], [the social worker] made contact with and interviewed [Hayley] at Trinity Place. [Hayley] acknowledged that she has been diagnosed with [m]ajor [d]epressive [d]isorder and that she and . . . [R]espondent[-M]other are in counseling together.

20. When questioned [by the social worker] about the allegations of the report . . . , [Hayley said] that she and . . . [R]espondent[-M]other both slapped each other. [Hayley said] that, after a verbal argument, . . . [R]espondent[-M]other walked into her room and reached out to smack her. [Hayley] stated that she "bopped" . . . [R]espondent[-M]other's arm and then hit . . . [R]espondent[-M]other. [Hayley said] this was the first time she had ever hit . . . [R]espondent[-M]other. [Hayley also said] that usually arguments with . . . [R]espondent[-M]other consist of . . . [R]espondent[-M]other yelling at her.

21. [Hayley] further disclosed to [the social worker] that . . . [R]espondent[-M]other often calls her names, including: "ungrateful brat," "ungrateful bitch," and "inconsiderate piece of shit." [Hayley] denied that there has ever been a physical altercation between herself and her brother . . . . [Hayley also] disclosed that she was "depressed" and that she was "sleeping a lot."

22. [The social worker] also made contact with . . . [R]espondent[-M]other and [Hayley's] sibling . . . . [The social worker] made contact with . . . [R]espondent[-M]other at her home. . . . [R]espondent[-M]other immediately told [the social worker] that she was not going to be

threatened by DSS and that she was not concerned [a]bout DSS attempting to press criminal charges against her. . . . [R]espondent[-M]other further stated that she did not care at this point what happened to [Hayley]. . . . [R]espondent[-M]other then began describing her issues with [Hayley]. . . . [R]espondent[-M]other stated that she hoped out-of[-home]-placement was [an] option because she [could not] continue to deal with [Hayley's] behavior[].

23. When questioned about the recent fight[,] . . . [R]espondent[-M]other stated that it sta[r]ted because [Hayley] said, "Fuck you, bitch." . . . [R]espondent[-M]other stated that she did[ not] immediately walk upstairs to [Hayley's] bedroom, as she felt she needed to calm down. . . . [R]espondent[-M]other stated that she spent some time outside; however, she came back inside with the very intention of "popping [Hayley] on the side of the mouth." . . . [R]espondent[-M]other stated that when she went to "pop" [Hayley], [Hayley] hit her first. . . . [R]espondent[-M]other stated that she feels like [Hayley] has put her through hell for the last year and caused a lot of stress on the family.

24. When questioned about any threats she has made to [Hayley], . . . [R]espondent[-M]other acknowledged that she said she would ["]beat [Hayley's] ass.["]

. . .

26. [The social worker's] investigation determined that the above incident, as specified in the report, and confirmed by [Hayley] and . . . [R]espondent[-M]other, was not an isolated incident. . . . [R]espondent[-M]other, [Hayley], and

[Hayley's sibling] confirmed multiple incidents of physical violence including [Hayley] being slapped on the side of the mouth by . . . [R]espondent[-M]other. [Hayley] stated that this was the first time that she had ever been "hit" by . . . [R]espondent[-M]other, but stated that she was frequently slapped by [Respondent-Mother].

. . .

28. [Another social worker] made her first contact with . . . [R]espondent[-M]other on September 10, 2012. . . . [R]espondent[-M]other was immediately hostile[,] stating "Let me tell you something, I am not doing counseling."

. . .

31. At trial, [the mental health therapist] confirmed that [Hayley] had been diagnosed with major depressive disorder and anxiety disorder.[4] He stated that [his employer, a counseling facility in the jurisdiction,] recommended [dialectical behavior] therapy for [Hayley] and medication management and individual therapy for . . . [R]espondent[-M]other. He indicated at the close of [the facility's] involvement in September 2012, [that] it was not safe for [Hayley] to return home due to the incidents of physical violence with [Hayley] and . . . [R]espondent[-M]other's resistance to treatment, despite the family having "successfully completed their contract with [the counseling facility]."

---

[4] The Guardian *ad Litem* concedes in its brief that "finding 31 attributes the anxiety diagnosis incorrectly to the juvenile rather than to [R]espondent[-M]other" and opines that this mistake is not a contradictory finding, but merely a "drafting error."

32. When questioned about [Hayley]'s most recent stay at Trinity Place . . . [,] [R]espondent[-M]other stated to [the other social worker] that she took [Hayley] to Trinity [Place] because she was afraid she was going to "[b]ash [Hayley's] head in." [Hayley] confirmed at trial that she had been placed at Trinity [Place] by . . . [R]espondent[-M]other three . . . times since 2012, because of "arguments."

. . .

37. During [Hayley's] interview with [the other social worker, [Hayley] looked defeated and stated that . . . [R]espondent[-M]other [had told] her that if she could get away with it, [Respondent-Mother] would punch [Hayley] in the face. [Hayley] further stated that . . . [R]espondent[-M]other "bitch slaps," her on a regular basis, leaving pink marks on her face that last for "10 minutes."

38. [Hayley's] court counselor . . . e[-]mailed . . . [R]espondent[-M]other advising her of the recommendation that [Hayley] participate in outpatient therapy. . . . [R]espondent[-M]other wrote back indicating that she was not going to comply. [Another organization] also contacted . . . [R]espondent[-M]other regarding therapy for [Hayley] and . . . [R]espondent[-M]other, again, refused to comply and declined services. . . .

. . .

41. . . . [R]espondent[-M]other repeatedly demanded that [DSS] take custody of [Hayley]. In addition, . . . [R]espondent[-M]other refused to provide any names for possible kinship placements.

42. At trial, despite her consistent disclosures to [the social workers] and other professionals, [Hayley] generally denied the allegations of the above report. [Hayley] testified that she did not use profanity, denied that . . . [R]espondent[-M]other hit her, and generally denied any physical fighting other than [that] . . . [R]espondent[-M]other "popped me a few times on the mouth." [Hayley] denied being afraid of . . . [R]espondent[-M]other and repeatedly stated that she "wanted to go home."

43. Based upon the above findings of fact as found by the [c]ourt, and by clear, cogent, and convincing evidence, [Hayley] is a neglected child . . . in that [she] lives in an environment injurious to [her] welfare. . . .

44. The [c]ourt specifically finds that . . . [R]espondent[-M]other was aware and had been advised that [Hayley] had been diagnosed with major depressive disorder; that . . . [R]espondent[-M]other was under a court order through her involvement with [the court counselor] that ordered therapy for [Hayley]; that . . . [R]espondent[-M]other interfered with, objected to, willfully obstructed[,] and other[]wise failed to comply with recommended therapy for [Hayley]. . . . [R]espondent[-M]other's frustration with [Hayley] rose to a level where she was making statements expressing her feelings and desires to harm [Hayley]. [Hayley] has made statements that . . . [R]espondent[-M]other has caused her harm.

45. . . . [R]espondent[-M]other has blamed [Hayley] for the family's problems; sought placement for [Hayley] out of the home

> several times; sought information as to how to emancipate [Hayley]. . . . [R]espondent[-M]other's testimony at trial indicates to the [c]ourt that she has no full understanding of [Hayley]'s issues, stating that "she just needs to get her shit together." . . . [R]espondent[-M]other's attitude and resistance to [the therapist's counseling facility] has materially interfered with [Hayley's treatment].

Given the above findings, the trial court adjudicated Hayley neglected and placed her in DSS custody. The court also ordered DSS to put Hayley in a trial placement with Respondent-Mother and required Respondent-Mother and Hayley to take various actions to repair their relationship, including participating in family therapy. Respondent-Mother appeals.

*Standard of Review*

"A proper review of a trial court's finding of neglect entails a determination of (1) whether the findings of fact are supported by 'clear and convincing evidence,' and (2) whether the legal conclusions are supported by the findings of fact." *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) (citations omitted). In making its findings of fact, the trial court has the discretion to determine the weight to be given to the evidence. *In re A.S.*, 190 N.C. App. 679, 690, 661 S.E.2d 313, 320, *disc. review denied*, 362 N.C. 681, 669 S.E.2d 740

(2008), *affirmed per curiam*, 363 N.C. 254, 675 S.E.2d 361 (2009).

## *Discussion*

On appeal, Respondent-Mother contends that the trial court's order should be reversed because its findings of fact: (1) "merely repeat[ testimony] without showing [that the court] independently determined the facts" and (2) do not support the trial court's conclusion that Hayley was neglected. We disagree.

When determining whether a child is neglected, the trial court must issue an order, in writing, which contains "appropriate findings of fact and conclusions of law." N.C. Gen. Stat. § 7B-807(b) (2013).

> The trial court's findings must consist of more than a recitation of the allegations contained in the juvenile petition. The trial court must, through processes of logical reasoning, based on the evidentiary facts before it, find the ultimate facts essential to support the conclusions of law. The findings need to be stated with sufficient specificity in order to allow meaningful appellate review.

*In re S.C.R.*, __ N.C. App. __, __, 718 S.E.2d 709, 711–12 (2011) (citations, internal quotation marks, and brackets omitted).

> If different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected. When there is directly conflicting evidence on key issues, it is

> especially crucial that the trial court make
> its own determination as to what pertinent
> facts are actually established by the
> evidence, rather than merely reciting what
> the evidence may tend to show.

*In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365–66 (citations omitted). "Failure to make specific findings of fact . . . will result in remand." *In re A.S.*, 203 N.C. App. 140, 141–42, 693 S.E.2d 659, 660 (2010) (citation omitted).

Respondent-Mother argues that the trial court's findings of fact "are not proper findings" because certain findings are based on hearsay and because the findings largely constitute recitations of evidence. Therefore, Respondent-Mother argues, the trial court's findings are insufficient to support its adjudication of neglect. In response, DSS and the Guardian *ad Litem* contend that the trial court made valid findings of fact in paragraphs 44, 45, and a portion of paragraph 26 of its order.[5] We agree with DSS and the Guardian *ad Litem*.

The majority of the trial court's "findings of fact" are not proper. As Respondent-Mother notes in her brief, findings of fact 13 through 17 describe *allegations* made in the child services report. These findings neither purport to resolve nor

---

[5] Specifically, the Guardian *ad Litem* argues that the trial court properly found in paragraph 26 that "multiple incidents of physical violence" occurred against Hayley.

actually resolve any issue of fact. Many of the other findings merely recite the testimony of the witnesses. Nonetheless, findings of fact 44 and 45 as well as the cited portion of finding of fact 26 sufficiently resolve the differences in the evidence presented during the hearing and make a determination based on that evidence to support the trial court's adjudication that Hayley is a neglected juvenile.

Moreover, this Court has already determined that "[t]here is nothing impermissible about describing testimony, so long as the [trial] court ultimately makes its own findings, resolving any material disputes." *In re C.L.C.*, 171 N.C. App. 438, 446, 615 S.E.2d 704, 708 (2005) (holding that the trial court did not err by "including findings of fact that summarized the testimony" when "[t]he testimony summaries were not the ultimate findings of fact" and the ultimate findings existed "elsewhere in the order"), *affirmed per curiam in part and disc. review improvidently allowed in part*, 360 N.C. 475, 628 S.E.2d 760 (2006). Therefore, as long as the relevant portions of findings 26, 44, and 45 are supported by clear and convincing evidence and, in turn, support the trial court's ultimate conclusions of law, it is unnecessary to remand the court's order for additional findings.

In its brief, the Guardian *ad Litem* describes the relevant elements of findings 26, 44, and 45 as follows:

> The trial court ultimately found "multiple incidents of physical violence against [Hayley in paragraph 26], refusal of . . . [Respondent-Mother] to allow [Hayley] to participate in therapy or receive services [in paragraph 44], frustration with [Hayley] to the point that [R]espondent[-M]other was "expressing her feelings and desires to harm [Hayley in paragraph 44]," laying responsibility for the family's problems on [Hayley in paragraph 45], pursuing removal of the child from the home several times to the point of considering her emancipation[ in paragraph 45], and lack of understanding of [Hayley's] issues [by Respondent-Mother in paragraph 45].

With a few exceptions, Respondent-Mother does not contend that these findings are not based on clear and convincing evidence. Respondent-Mother does, however, contest the validity of finding 26 as it pertains to "multiple incidents of physical violence" on grounds that Hayley's sibling, cited by the trial court as one of the sources for this determination, did not testify. She also attacks finding 44 regarding whether Respondent-Mother obstructed, interfered with, and failed to comply with counseling. We are unpersuaded by her challenges.

Respondent-Mother is correct that Hayley's sibling did not testify during the hearings. Nonetheless, it is clear from Hayley's testimony, alone, that she was subjected to multiple

instances of violent conduct. During the 20 February 2013 hearing, Hayley described an altercation in which she hit Respondent-Mother and Respondent-Mother became upset, grabbed Hayley's arm, grabbed Hayley's hair, and raised her hand as if to hit Hayley, but refrained from doing so. Later, Hayley testified that her mother had slapped her at least three times. Even without the testimony of Hayley's sibling, this evidence is sufficient to support a finding that there were multiple instances of physical violence in the home. Therefore, Respondent-Mother's argument is overruled as it pertains to finding 26.

With regard to finding 44, Respondent-Mother argues that testimony tending to show that she "was adversarial toward counseling and controlled part of the [therapy] interaction" does not constitute clear and convincing evidence that she willfully obstructed or failed to comply with counseling. Respondent-Mother also notes that she and Hayley "successfully completed" certain in-home, intensive counseling sessions. This argument is unpersuasive.

The mental health therapist testified that Respondent-Mother was "very contentious and adversarial right — right from the beginning" of in-home therapy. The therapist went on to

testify that Respondent-Mother refused to allow one of the therapy workers into her home, forcing the team to "curtail[]" their approach. This evidence is sufficient to support the trial court's finding that Respondent-Mother "interfered with, objected to, willfully obstructed[,] and other[]wise failed to comply with recommended therapy for [Hayley]." Therefore, Respondent-Mother's argument as it pertains to this finding is overruled.

As noted above, Respondent-Mother does not contest the remaining aspects of findings 26, 44, and 45 as unsupported by the evidence. Accordingly, they are binding on appeal. *See In re J.M.W.*, 179 N.C. App. 788, 792, 635 S.E.2d 916, 919 (2006) ("If unchallenged on appeal, findings of fact are . . . binding upon this Court.") (citations omitted). The only remaining question is whether findings of fact 26, 44, and 45 are sufficient to support the trial court's adjudication that Hayley is neglected. We hold that they are.

Citing Chapter 7B of the North Carolina General Statutes, this Court has defined a neglected juvenile as follows:

> [O]ne who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care;

> or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.

*In re S.C.R.*, 198 N.C. App. 525, 534, 679 S.E.2d 905, 911 (citing N.C. Gen. Stat. § 7B-101(15)), *appeal dismissed*, 363 N.C. 654, 686 S.E.2d 676 (2009). "Section 7B-101(15) affords the trial court some discretion in determining whether children are at risk for a particular kind of harm given their age and the environment in which they reside." *In re C.M.*, 183 N.C. App. 207, 210, 644 S.E.2d 588, 592 (2007) (citation and internal quotation marks omitted).

"In order to adjudicate a juvenile neglected, our courts have . . . required that there be some physical, mental, or emotional impairment of the juvenile *or a substantial risk of such impairment* as a consequence of the failure to provide proper care, supervision, or discipline." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (citations and internal quotations marks omitted; emphasis added).

> It is well-established that the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home. Severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile may include . . . physical abuse or injury to a child inflicted by the parent. Other conduct that

> supports a conclusion that a child is neglected includes exposing the child to . . . threatening or abusive behavior toward social workers and police officers in the presence of the children.

*In re D.B.J.*, 197 N.C. App. 752, 755, 678 S.E.2d 778, 780–81 (2009) (citations and internal quotation marks omitted).

In this case, the trial court found as fact that: Respondent-Mother participated in "multiple instances of physical violence" against Hayley; "interfered with, objected to, willfully obstructed[,] and other[]wise failed to comply with" Hayley's recommend therapy; expressed a desire to harm Hayley; blamed Hayley for the family's problems; and sought to remove Hayley from the home. At a minimum, these findings establish that Hayley was living in an environment injurious to her welfare, which put her at a substantial risk of physical, mental, or emotional impairment. *See, e.g.*, *In re L.T.R.*, 181 N.C. App. 376, 384–85, 639 S.E.2d 122, 127–28 (2007) (affirming the trial court's determination that the children were neglected on grounds that "the children's physical, mental, and emotional well-being was, at a minimum, at substantial risk of being impaired because of improper care" when (1) the mother admitted to "thumping" her daughter in the face as a part of a "game" in such a way as to leave a bruise on the daughter's face and (2)

the father bruised the son's upper leg by hitting him with a brush); *In re C.P.*, 181 N.C. App. 698, 704, 641 S.E.2d 13, 17 (2007) (affirming the trial court's determination that the children were neglected when the mother delayed seeking necessary medical care for the youngest child for bruising and delayed seeking help for disciplinary, behavioral, and developmental problems displayed by all the children). Therefore, the trial court's order adjudicating Hayley to be a neglected juvenile is

AFFIRMED.

Judges CALABRIA and ELMORE concur.

Report per Rule 30(e).